Filed 4/6/16  P. v. Davis CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B255790 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BA412199) |
| MARQUISE DAVIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jose I. Sandoval, Judge.  Affirmed as modified.

Karyn H. Bucur, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle and Russell A. Lehman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Following a jury trial Marquise Davis was convicted of three counts of robbery and one count of attempted robbery with true findings on related firearm-use and criminal street gang enhancements. On appeal Davis contends the court erred in admitting evidence of two uncharged robberies to prove a common plan or scheme and identity. Davis also contends the trial court improperly allowed the People's gang expert to present inadmissible hearsay evidence to the jury in the guise of an opinion to establish an essential element of the criminal street gang enhancements and argues the evidence was, in any event, insufficient to support the jury's true findings on those enhancements. He also challenges aspects of his sentence. We modify the judgment to correct an unauthorized sentence not identified by the parties and, as modified, affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Amended Information*

An amended information charged Davis with three counts of robbery (Pen. Code, § 211)[1] (counts 2, 3 and 4) and one count of attempted robbery (§§ 664, 211) (count 1) in connection with crimes committed on November 23, 2012. As to each count, the information specially alleged a principal had been armed with an assault weapon (§ 12022, subd. (a)(2)); a principal had personally used a firearm, "to wit, a rifle" (§ 12022.53, subds. (b), (e)(1)); Davis had personally used a firearm (§ 12022.5, subd. (a)); and the offense was committed to benefit a criminal street gang (§ 186.22, subd. (b)(1)(C)).[2] Davis pleaded not guilty and denied the special allegations.

---

[1] Statutory references are to this code unless otherwise indicated.

[2] For simplicity on occasion this opinion uses the shorthand phrase "to benefit a criminal street gang" to refer to crimes that, in the statutory language, are committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b); see *People v. Jones* (2009) 47 Cal.4th 566, 571, fn. 2.)

### 2. *The Charged Robberies*

#### a. *The Little Caesars robberies* (*counts 1, 2 and 4*)

Davis was tried together with his codefendant, Davon Winston.[3] According to the evidence at trial, on November 23, 2012 at 5:30 p.m. two men entered a Little Caesars restaurant on the corner of Avalon and 103rd Streets in Los Angeles. Both men wore dark knit ski caps pulled down over their faces with two holes cut in the fabric for the eyes. The taller man carried a long rifle, which expert testimony identified as an SKS assault rifle; the other man carried a handgun that appeared to be a mini-Uzi, a type of submachine gun. The shorter man wore red and white floral patterned shorts and a white sweatshirt with blue and dark blue stripes and writing across the front. The taller man wore a black jacket with distinctive lapels and a buttoned pocket on the arm.

Upon entering the restaurant the taller man directed his attention to the employees behind the cash registers while the shorter man ran to the back to corral other people in the restaurant. The taller man ordered restaurant employee Nancy Martinez to open all three of the restaurant's cash registers and the safe, and he took the money from all of them. During this time the shorter man ordered store employees to get down on the ground. He pointed his gun at employee Ladye Lorenzo and demanded she give him her cell phone and anything she had "made of gold." Lorenzo gave him her phone and her bracelet. The shorter robber also ordered employee Maria Silerio to give him her rings. Silerio attempted to comply, but her rings fell; the robber did not retrieve them. After the two men left, an employee called the police and reported the crimes. Surveillance video of the incident and the audio recording of the police emergency call were played for the jury.

---

[3] Winston's appeal from his convictions is currently pending in this court.

b. *The robbery of Abu Taher (count 3)*

Abu Taher's smoke shop is located at 626 East Manchester in Los Angeles, approximately one mile from the Little Caesars restaurant. At 6:00 p.m. on November 23, 2012, while Taher and customer Daniel Hernandez were in the shop, two men with masks pulled down over their faces entered. The taller man carried an assault rifle; the shorter one held a handgun that resembled a mini-Uzi. The man with the rifle ordered Taher to open the cash register; the other man pointed his gun at Hernandez and directed him to retrieve cartons of cigarettes and a red box of Swisher Sweet cigars. Neither Taher nor Hernandez could describe the gunmen's clothing.

A witness saw the robbers flee the smoke shop in a grey car and reported the car's license plate. Police officers found the car the same evening. After determining the car had been abandoned, officers impounded and searched it. Inside, they found a pair of red and white floral patterned shorts like the shorts worn by the shorter gunman during the Little Caesars robberies; a black jacket with distinctive lapels similar to the jacket worn by the taller man at Little Caesars; a black knit ski cap with holes cut out for the eyes; a black jacket with a brown, fur-trimmed hood; and a red box of Swisher Sweet cigars.

Forensic testing of the red and white shorts revealed multiple DNA contributors, including Davis;[4] forensic testing of the modified knit ski cap identified Winston as a major contributor of DNA with other minor contributors.[5] No DNA was found on the black jacket. The jacket with the brown fur-trimmed hood was not tested for DNA. A photograph taken a little more than a week before the charged robberies showed Davis wearing a black jacket with a brown fur-trimmed hood.

---

[4]    Forensic testimony established the probability of randomly selecting an unrelated individual with the same DNA profile was 1 in 9,000 among the African-American population in the United States, 1 in 76,000 among the Caucasian population in the United States and 1 in 110,000 among the Hispanic population in the United States.

[5]    Forensic testimony established the probability of randomly selecting an unrelated individual with the same DNA profile was 1 in 90 million among the African-American population in the United States, 1 in 1.5 billion among the Caucasian population and 1 in 1.1 billion among the Hispanic population in the United States.

3. *Evidence of Uncharged Offenses:  The Subway and Starbucks Robberies*

Following a pretrial hearing on the admissibility of two uncharged robberies, the trial court overruled Davis's objections and permitted the People to introduce evidence of them under Evidence Code section 1101, subdivision (b), to show a common scheme or plan or identity.  The court found the probative value of the evidence was not substantially outweighed by the potential for prejudice.[6]

a. *The uncharged Subway robbery*

On November 26, 2012, three days after the charged robberies, two African-American men wearing knit ski masks over their faces with holes cut for the eyes entered a Subway sandwich shop on Manchester and Central in Los Angeles at 1:15 a.m. and screamed at everyone in the shop to get down on the ground and to hand over their cell phones.  The taller man, armed with a long gun that appeared to be an assault rifle, ordered the employees behind the counter to open the cash registers and then the safe; the shorter man ran to the back of the shop.  The employees did not have the key to the safe and could not open it.  After their driver left the scene, the robbers demanded their victims' car keys.  Only Aleah Porter, a customer, admitted to having keys.  She was subsequently forced to drive the men from the store.

Porter testified to these events at trial, and a surveillance video of the robbery was played for the jury.  Porter also explained, after she had handed over her car keys, the men ordered her at gunpoint to accompany them to her car and told her to drive them away.  Later, the robbers, who referred to each other in the car as "Blood" and "Mook" or "Monk," took off their masks; and the shorter man switched places with Porter and took over driving.  He wore tan pants and a Louis Vuitton belt.  When they passed a Little Caesars restaurant, one of the men suggested they stop and rob it; but Porter pleaded with them not to do that with her in the car.  The driver told Porter he was a "rapper" and had

---

6      The two uncharged offenses were the subject of a separate information filed after the charges in the instant case.  The prosecutor's request to join the two cases had been denied.

"rapped with Joe Moses." The shorter robber asked Porter for her driver's license and kept it. When Porter began to cry, both men assured her they would not hurt her.

Porter could not identify the robbers in a photographic line up (a "six pack"). Several weeks later, following a live lineup, Porter pointed out three people including Davis and stated Davis "looked like" the driver. In a separate live lineup she also identified Winston, but wrote "maybe." At trial Porter testified only that she recognized Davis and Winston as the men she had selected during the two live lineups. She explained she felt fairly confident about her identification of Winston because his face had "stayed with her." She admitted on cross-examination she was not certain about her identification of Davis as the driver.

b. *The uncharged Starbucks robbery*

On December 22, 2012 two men wearing knit ski masks similar to those worn in the charged robberies entered a Starbucks on the corner of Sunset Boulevard and Gower Street in Hollywood. The taller of the two men displayed a silver Desert Eagle handgun and ordered the manager to open the register. The robbers took money from the register, two cell phones from Starbucks employees and fled in a silver Dodge Charger driven by a third person. A short time later, using a global positioning device to track one of the stolen cell phones, police located the Dodge Charger with Davis, Winston and two female companions inside. Davis was arrested at the scene. Winston ran when he saw police, but was later apprehended. Police recovered a Desert Eagle handgun from the vehicle and four cellular telephones on the floor of the car. None of the cell phones was registered to Davis. The jury was also shown surveillance video of the Starbucks robbery.

4. *Evidence of Photographs Recovered on a Cell Phone Found in the Car with Davis at the Time of His Arrest*

An unregistered cell phone found in the car with Davis at the time of his arrest contained numerous photographs along with data establishing the date and time each photograph was taken. Among the photographs recovered and shown to the jury were: (1) a person with a ski mask pulled down over the face (with holes cut for the eyes),

6

wearing the same shirt the shorter robber had worn during the Little Caesars robbery and holding a handgun that resembled a mini-Uzi; the gunman's hands are exposed revealing tattoos that appeared to match Davis's; and the date- and time-stamp data show the photograph was taken the morning of the charged robberies; (2) a close-up image of a handgun resembling the smaller gun described in the charged robberies; (3) an image Davis took of himself in the mirror on November 29, 2012 showing him holding a rubber-banded wad of bills; (4) an image of Davis wearing tan pants and a Louis Vuitton belt taken the evening of November 25, 2012, a few hours before the 1:30 a.m. Subway robbery; (5) an image of Davis and Winston together on November 25, 2012 in which Davis is wearing tan pants and Winston is wearing a jacket resembling that worn by the Subway robber a few hours later; (6) photographs of Davis and Winston standing together displaying gang signs; Davis appears to be several inches shorter than Winston.

5. *Statements by Davis and His Codefendant*

Before interviewing Davis and Winston, police placed them together in the same holding cell and recorded their conversation, portions of which were played to the jury. Davis asked Winston what he thought police wanted to talk to them about. Winston replied, "I have no idea, Smoker." Davis responded, "I hope it's not Subway or Little C's"; and Winston said, "If it ain't one thing, it's another, man."

During his interview with police, Davis stated he was a rapper, had performed with Joe Moses and his street name was "young Monk." He also gave a home address that was located near the alley where the gunmen had released Porter following the Subway robbery.

6. *Gang-related Evidence*

Davis and Winston were members of the 92 Bishop Bloods gang. Each man had several gang tattoos, which were photographed and shown to the jury. Los Angeles County Deputy Sheriff Antonio Guillen, a 22-year law enforcement veteran and gang investigator who was familiar with the 92 Bishop Bloods and had patrolled the area they controlled, testified as an expert witness on criminal street gangs. Based on his experience as a law enforcement officer in the area controlled by the 92 Bishop Bloods

7

gang, including conversations with, and arrests of, 92 Bishop Bloods gang members, Guillen testified the gang's primary activities were selling narcotics, robberies, burglaries and vandalism. Given a hypothetical resembling the facts of this case, Guillen opined the charged robberies in this case were committed to benefit the gang. Guillen explained such robberies enhance the reputation of the gang and elevate the reputation of the gang members who had committed the crimes. He also cited instances in which gang members use the proceeds from robberies and the sale of contraband, including stolen cell phones, to purchase drugs to benefit the gang.

To establish the 92 Bishop Bloods' pattern of criminal gang activity, the prosecutor introduced evidence of criminal convictions in two earlier cases, *People v. Johnson* case no. VA121110 (robbery) and *People v. Keller* case no. VA119188 (possession of narcotics for sale) and asked Detective Guillen if he had an opinion whether the defendants in those cases had been members of the 92 Bishop Bloods at the time they committed the crimes. Guillen responded the two men, Johnson and Keller, had been members of the 92 Bishop Bloods when they were convicted of their crimes, an opinion, he explained, that was based entirely on statements made to him by the arresting officers in the two cases. No other evidence was offered to demonstrate Johnson's and Keller's gang membership; the jury was instructed, however, it could also consider Davis and Winston's participation in the charged offenses in determining whether the People had established a pattern of criminal gang activity.

Martin Flores testified as a gang expert for the defense. He has run a youth center for more than 14 years in Watts and is familiar with gangs generally and the 92 Bishop Bloods specifically. According to Flores, gang members commit crimes to benefit themselves, not the gang, and it is rare for a gang member to turn over the proceeds from a robbery to the gang.

7. *Other Defense Evidence*

Davis did not testify. The defense theories were alibi and mistaken identity. Davis's grandmother testified he had been with her at her house at 4:00 p.m. on November 23, 2012 and had remained there the rest of the day and night.

8. *The Verdict and Sentence*

The jury found Davis guilty on all counts and found true each of the specially alleged firearm-use and gang enhancements. Davis was sentenced to an aggregate state prison term of 53 years eight months.

**DISCUSSION**

1. *The Admissibility of Uncharged Acts*: *The Subway and Starbucks Robberies*

a. *Governing law and standard of review*

Evidence Code section 1101, subdivision (a), "prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393; accord, *People v. Rogers* (2013) 57 Cal.4th 296, 325 ["""[e]vidence that a defendant has committed crimes other than those currently charged is not admissible to prove that the defendant is a person of bad character or has a criminal disposition"""]; *People v. Foster* (2010) 50 Cal.4th 1301, 1328 [same]; see *People v. Falsetta* (1999) 21 Cal.4th 903, 913 (*Falsetta*) ["'[t]he rule excluding evidence of criminal propensity is nearly three centuries old in the common law'"].)

Evidence Code section 1101, subdivision (b), however, clarifies that this rule "'does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition,' such as identity, common plan or intent," provided the charged and uncharged offenses are sufficiently similar to support a rational inference of those facts or of some other fact unrelated to the defendant's propensity to commit the charged offenses. (*People v. Edwards* (2013) 57 Cal.4th 658, 711; accord, *People v. Jones* (2013) 57 Cal.4th 899, 930; *People v. Rogers, supra,* 57 Cal.4th at p. 326; see *Falsetta, supra,* 21 Cal.4th at p. 914 ["the rule against admitting evidence of the defendant's other bad acts to prove his present conduct [is] subject to far-ranging exceptions," citing Evid. Code, § 1101, subd. (b)].)

The least degree of similarity between the uncharged act and the charged offense is required to support a rational inference of intent; a greater degree of similarity is

9

required for common design or plan; the greatest degree of similarity is required for identity. (*People v. Rogers, supra*, 57 Cal.4th at p. 326; *People v. Edwards, supra,* 57 Cal.4th at p. 711.) In particular, to be admissible to prove the existence of a common scheme or plan, evidence of uncharged misconduct must demonstrate """not merely a similarity in results, but such a concurrence of common features that the various acts are naturally explained as caused by a general plan of which they are the individual manifestations." [Citations.]' . . . '[E]vidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts.'" (*People v. Leon* (2015) 61 Cal.4th 569, 598.)

When offered to prove identity, "'the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive as to support the inference that the same person committed both acts.'" (*People v. Leon, supra,* 61 Cal.4th at p. 598; accord, *People v. Ewoldt, supra,* 7 Cal.4th at p. 403.) The "common features need not be unique or nearly unique; 'features of substantial but lesser distinctiveness may yield a distinctive combination when considered together.'" (*Leon,* at p. 598; accord, *People v. Scott* (2011) 52 Cal.4th 452, 473.)

In addition, to be admissible under Evidence Code section 1101, subdivision (b), the probative value of the evidence of the uncharged crimes must be substantial and must not be largely outweighed by the probability its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury. (*People v. Rogers, supra,* 57 Cal.4th at p. 326; *People v. Foster, supra,* 50 Cal.4th at p. 1328; see § 1101, subd. (b).)

We review the trial court's determination of the admissibility of evidence of uncharged offenses under Evidence Code section 1101, subdivision (b), for abuse of discretion. (*People v. Leon, supra,* 61 Cal.4th at p. 597; *People v. Edwards, supra,* 57 Cal.4th at p. 711.)

b. *The Subway robbery was properly admitted to show common scheme or plan and identity*

Davis acknowledges the Subway robbery shared certain similarities with the charged robberies of the Little Caesars restaurant and the smoke shop—all involved two men wearing masks, carrying firearms and taking money and items from cash registers and customers—but insists those similarities are not sufficiently distinctive to permit evidence of the uncharged offenses to show a common scheme or plan, much less to prove identity. (See *People v. Haston* (1968) 69 Cal.2d 233, 248 [where the similarities between the charged and uncharged crimes are so generic as to be shared by "very many armed robberies," uncharged offense not admissible for showing identity through a common modus operandi]; *People v. Harvey* (1984) 163 Cal.App.3d 90, 104 [same].)

The similarities between the uncharged Subway robbery and the charged offenses are not nearly as generic as Davis attempts to paint them. In each case, two robbers working in concert, one observably taller than the other, wearing the same type of modified knit ski masks and carrying the same type of distinctive assault weapon, robbed small establishments. In addition, the robberies occurred within three days of each other in close proximity to one another. Moreover, in each instance the taller of the two perpetrators took the lead upon entry to go to the cash registers while the shorter man focused on controlling other employees or customers and demanding their possessions. Considering the distinctive features in the aggregate, the court did not abuse its discretion in determining the uncharged Subway robbery was relevant and admissible to prove common plan or identity. (See *People v. Leon, supra,* 61 Cal.4th at p. 598 [prior robberies, which occurred in same geographic area during a few days of each other and involved same weapon were admissible to show common plan]; *People v. Myers* (2014) 227 Cal.App.4th 1219, 1225 [prior uncharged robbery sufficiently similar to current offense to show common plan]; see also *People v. Miller* (1990) 50 Cal.3d 954, 989 [uncharged act admissible to prove modus operandi; while it is true a large number of violent crimes may occur in a relatively small geographic area simply because of the density of urban living, the likelihood those crimes are unrelated diminishes "as those

11

crimes are found to share more and more common characteristics"]; *People v. Beamon* (1973) 8 Cal.3d 625, 634 ["although some of the recited marks may be common to many highjackings of liquor trucks, there are too many similar marks to be ignored"]; see generally *People v. Balcom* (1994) 7 Cal.4th 414, 425 ["that the uncharged offense occurred *after* the charged offense does not lessen its relevance in demonstrating the existence of a common design or plan"].)

The trial court also determined the probative value of the evidence of the Subway robbery substantially outweighed any risk of prejudice. As just discussed, the Subway robbery involved the same pattern of behavior and was thus directly relevant to both common plan and identity. Nonetheless, other aspects of the Subway episode were wholly dissimilar to the charged offenses. In particular, Porter was permitted to testify to acts following the robbery itself that, fairly interpreted, amounted to carjacking, kidnapping and possible witness intimidation (taking Porter's driver's license). The properly admitted evidence Porter offered that identified Davis as one of the Subway robbers and placed him, through a common plan, at the Little Caesars and smoke shop robberies could have been elicited in a more sanitized form without highlighting the dissimilar, and more inflammatory, uncharged misconduct. (See *People v. Ewoldt, supra,* 7 Cal.4th at p. 404 [a primary factor affecting balancing of probative value with prejudicial effect of uncharged act is whether evidence of uncharged acts is stronger or more inflammatory than the evidence of the charged offenses]; *People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274 [same].)

Although we are concerned about the more inflammatory aspects of Porter's testimony concerning the aftermath of the uncharged Subway robbery, we need not resolve whether the admission of that evidence in its unsanitized form amounted to an abuse of the court's discretion under Evidence Code section 352[7] because it is not

---

[7] In his colloquy with the court during the Evidence Code section 402 hearing on the admissibility of this evidence, defense counsel highlighted the prejudicial nature of Porter's delayed identification without addressing directly the prejudicial effect of her testimony concerning the carjacking and kidnapping. Nonetheless, Davis's objection to

12

reasonably probable Davis would have obtained a more favorable verdict absent the alleged error. (See *People v. Carter* (2005) 36 Cal.4th 1114, 1152 [error in failing to exclude evidence of uncharged misconduct does not require reversal "unless it is reasonably probable the outcome would have been more favorable to defendant had such evidence been excluded"]; *People v. Walker* (2006) 139 Cal.App.4th 782, 808 [same].)

There was overwhelming evidence the same two men committed both the Little Caesars robbery and the smoke shop robbery. Both crimes, occurring within 30 minutes of each other, involved two men wearing knit ski masks who were armed with the same type of weapons; and the getaway car used in the smoke shop robbery also contained the same shorts, black jacket and modified knit ski mask worn by the robbers in the Little Caesars robbery. The evidence as to Davis's guilt was also substantial: Davis is depicted in a photograph taken the morning of the Little Caesars robbery wearing the same modified ski mask and distinctive sweater and carrying the same weapon as worn and carried by the more diminutive robber in the Little Caesars robbery. Davis's DNA (though certainly not conclusive) was found on the shorts worn by the smaller Little Caesars robber; and Winston's DNA (far more conclusive) was found on the ski mask in the car used by the smoke shop robbers, suggesting Davis and Winston had committed the charged crimes together. Davis and Winston are also shown in photographs taken a few hours before the substantially similar Subway robbery wearing the same clothes as the Subway robbers. Moreover, Davis's statement to Winston while in custody that he hoped the police did not want to talk to them about "Little C's [(Little Caesars)] and Subway" was highly incriminating. The court instructed the jury several times that Porter's testimony was offered to prove common scheme or plan or identity and was not to be considered for any other purpose. On this record, it is not reasonably probable that the jury would have reached a more favorable verdict even if the evidence involving the more inflammatory aspects of the Subway robbery had been sanitized or excluded.

---

the introduction of the Subway robbery under Evidence Code section 352 is sufficient to preserve the issue for appellate review.

c. *The admission of the Starbuck's robbery, even if error, was harmless*

Davis contends the court erred in admitting details of the Starbucks robbery. There is little question the uncharged Starbucks robbery shared similarities with the charged offenses. Like the charged offenses, it involved two men wearing distinctive masks, robbing a small food/convenience establishment and demanding customers turn over their personal items, including cell phones. On the other hand, unlike the charged offenses, only one of the masked men in the Starbucks robbery was armed; the armed robber carried a different type of firearm from that used in the charged robberies; and the robbery itself, while committed within a few weeks of the charged robbery, lacked the same degree of temporal and geographic similarity that characterized the charged offenses and the uncharged Subway robbery. We need not determine whether the court abused its discretion in admitting evidence of the Starbucks robbery. Because some evidence of that robbery would have been admissible to provide context for Davis's arrest and the crime itself was no more inflammatory than the other charged and uncharged crimes properly admitted, any error in admitting the evidence as to the Starbucks robbery was harmless.

2. *The Court Did Not Abuse Its Discretion in Admitting Winston's Statement; Even if Error, Admission of This Entirely Cumulative Evidence Was Harmless*

As discussed, Davis's recorded jailhouse conversation with Winston was played for the jury. In that conversation Davis stated he hoped police did not want to talk to the two of them about "Little C's and Subway." Winston responded, "If it ain't one thing, it's another, man . . . ." The trial court admitted Davis's statement against him as an admission, a broad exception to the hearsay rule. (Evid. Code, § 1220 ["[e]vidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party"].) It also determined that Winston's reply, reasonably interpreted, was relevant and admissible against him as an adoptive admission of Davis's incriminating statement. (See Evid. Code, § 1221 ["[e]vidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct

14

manifested his adoption or his belief in its truth"]; *People v. Silva* (1988) 45 Cal.3d 604, 624 ["by reason of the adoptive admissions rule, once the defendant has expressly or impliedly adopted the statements of another, the statements become *his own admissions*, and are admissible on that basis as a well-recognized exception to the hearsay rule"].) The court instructed the jury as to the criteria for adoptive admissions, explaining the jury could not consider Winston's response against him for any reason unless it found the statement met the criteria for an adoptive admission.[8]

Davis contends the court erred in admitting Winston's reply because Davis's statement was not accusatory and thus not one to which Winston could have been expected to respond or object. (See *People v. Combs* (2004) 34 Cal.4th 821, 842-843 ["Admissibility of an adoptive admission is appropriate when "'a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution . . . .""""]; *People v. Riel* (2000) 22 Cal.4th 1153, 1189 [same].)

Although Winston's reply could reasonably be interpreted against Winston as an adoption of Davis's incriminating statement—that he and Davis had committed the Little Caesars and Subway robberies together and he hoped the police did not know about those crimes (*People v. Combs, supra*, 34 Cal.4th at p. 844; *People v. Preston* (1973) 9 Cal.3d 308, 313-314)—it had no independent significance with respect to Davis's guilt.

---

8        The court instructed the jury with CALCRIM No. 357:  "If you conclude that someone made a statement outside of court that tended to connect the defendant with the commission of the crime and the defendant did not deny it, you must decide whether each of the following is true:  [¶]  1.  The statement was made to the defendant or made in his presence; [¶] 2.  The defendant heard and understood the statement; [¶] 3.  The defendant would, under all the circumstances, naturally have denied the statement if he thought it was not true; AND  [¶] 4.  The defendant could have denied it but did not.  [¶]  If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true.  [¶]  If you decide that any of these requirements has not been met, you must not consider either the statement or the defendant's response for any purpose."

Nonetheless, even if it were error to admit Winston's statement against Davis, it was Davis's own indisputably admissible and self-incriminating statement that Winston allegedly adopted. Thus, any error in admitting Winston's reply against Davis at trial was plainly harmless. (See *People v. Samuels* (2005) 36 Cal.4th 96, 121; *People v. Watson* (1956) 46 Cal.2d 818, 836.)[9]

### 3. *Any Error in Permitting the Gang Expert To Rely on Inadmissible Hearsay To Establish a Pattern of Criminal Gang Activity Was Harmless*

To obtain a true finding on a criminal street gang enhancement allegation, the People must prove the underlying offense was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) As used in this statute, "'criminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated [in portions of section 186.22, subdivision (e)], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).)

"The phrase 'primary activities' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) The phrase a "'pattern of criminal gang activity' means the commission of, attempted commission" of two or more statutorily listed offenses and requires that the last offense occurred within three years after a prior offense and the offenses were committed on separate occasions by two or more persons. (§ 186.22, subd. (e).) Charged offenses can be included in the crimes relied upon to show a pattern of criminal gang

---

[9] Davis does not argue Winston's statement, "If it ain't one, thing it's another, man," had any separate, independent inculpatory meaning other than as an adoptive admission of Davis's own statement concerning Subway and "Little C's."

activity. (*People v. Loeun* (1997) 17 Cal.4th 1, 10; *People v. Bragg* (2008) 161 Cal.App.4th 1385, 1401.)

To prove a "pattern of criminal gang activity" by the 92 Bishop Bloods, the People presented documentary evidence of the criminal convictions of two other men, John Brown Keller (convicted of robbery) and Frederick Johnson (convicted of possession of narcotics for sale). Because that documentary evidence did not establish Keller and Johnson were 92 Bishop Bloods gang members at the time of their offenses, however, the prosecutor asked Detective Guillen if he had an opinion whether Johnson and Keller were members of the 92 Bishop Bloods at that time. Detective Guillen responded yes and offered his opinion Keller and Johnson were members of the 92 Bishop Bloods at the time they committed the identified crimes. Asked to explain the basis for his opinion, Guillen stated he had spoken with the investigating officers in both cases and was told by each of them that Keller and Johnson had been members of the 92 Bishop Bloods. Davis objected on foundation and hearsay grounds. The court overruled the objections and permitted the testimony, ruling that under *People v. Gardeley* (1996) 14 Cal.4th 605, 615-616 (*Gardeley*), Guillen could base his expert opinion on hearsay, including out-of-court statements made to him by other law enforcement officers.[10]

In *Gardeley* the Supreme Court held the culture and habits of a criminal street gang are proper subjects for expert opinion. (*Gardeley, supra,* 14 Cal.4th at p. 617; accord, *People v. Albillar* (2010) 51 Cal.4th 47, 64; *People v. Gonzalez* (2006) 38 Cal.4th 932, 944-946.) The Court also reiterated the well-established principle that an expert may state the basis of his or her opinion even when that material includes inadmissible

---

10    With respect to Johnson Detective Guillen stated simply, "My opinion is that he was a gang member. And it's based on the fact that I spoke to Deputies Lopez . . . and Deputy Salazar," whom Guillen identified as the deputies who had arrested Johnson for possession of narcotics for sales in the territory claimed by the 92 Bishop Bloods. Detective Guillen stated in his opinion Keller was also a member of the gang. "The basis of my opinion is that I spoke to Detective Lozano who handled that attempt robbery case. And Mr. Keller admitted to Detective Lozano . . . that he was a 92 Bishop gang member known as Slim."

hearsay.  (*Gardeley,* at p. 618; accord, *People v. Linton* (2013) 56 Cal.4th 1146, 1200; see Evid. Code, §§ 801, subd. (b) [expert may rely on matters personally known or made known to him before hearing whether or not admissible], 802 [witness may testify as to basis for expert opinion].)  In this context the hearsay evidence is offered solely as the basis of the expert's opinion, not for the truth of the matter asserted.  (*Gardeley,* at p. 619 [expert witness may rely for his opinion on matters learned from gang members or other law enforcement officers]; *Albillar,* at p. 63; *People v. Sengpadychith, supra,* 26 Cal.4th at p. 324; but see *People v. Miller* (2014) 231 Cal.App.4th 1301, 1311 ["the jury, in evaluating expert testimony, will almost always assume or determine the truth of this basis evidence"].)

As *Gardeley* recognized, however, albeit in a somewhat different context, sources relied on by an expert may not be used to "transform inadmissible matter into 'independent proof' of any fact."  (*Gardeley, supra,* 14 Cal.4th at p. 619; see *People v. Baker* (2012) 204 Cal.App.4th 1234, 1246 ["although qualified experts may rely upon and testify to the sources on which they base their opinions, including hearsay of the type reasonably relied upon by professionals in their field [citation], they may not relate the out-of-court statement of another as independent proof of the facts asserted in the out-of-court statement"]; *People v. Hill* (2011) 191 Cal.App.4th 1104, 1133 ["basis evidence is not admissible as independent proof of the facts stated therein or to help establish a prima facie case"].)

Here, although the prosecutor framed his inquiry, and Detective Guillen his answer, in the form of an opinion, the hearsay information he relayed about Johnson and Keller's gang membership lacked any connection with his own personal knowledge or expertise.  Indeed, anyone who had spoken to the arresting officers in those cases, whether or not a gang expert, could have provided the same answers to the prosecutors; Guillen was simply the channel by which the views of the deputies who had arrested Johnson and Keller were placed before the jury.  If this does not cross the line articulated in *Gardeley* between permissible expert testimony and independent proof of a fact through inadmissible hearsay, it certainly comes close.  (Cf. *People v. Valadez* (2013)

18

220 Cal.App.4th 16, 29 [gang expert with years of experience in gang enforcement division did not rely solely on information he obtained from gang members or "simply recite statements by others; he fit the information into all the other sources and his own experience to render his opinion"]; *People v. Hill, supra,* 191 Cal.App.4th at p. 1124 ["'[t]he officers did not simply recite what they had been told, but instead provided foundational testimony for their opinions which was sufficiently corroborated by other competent evidence, both physical and testimonial'"].)   In addition, had Guillen obtained this information from his fellow officers in preparation for his testimony at trial, the related hearsay would be testimonial and would raise the possibility of a Sixth Amendment violation as articulated in *Crawford v. Washington* (2004) 541 U.S. 36 [124 S.Ct. 1354, 158 L.Ed.2d 177]—an issue now pending in the Supreme Court.[11]

We need not decide whether the evidence was improperly admitted or whether it violated Davis's right to confrontation under the Sixth Amendment, however, because any error was harmless under any standard.  (See *People v. Watson*, *supra* 46 Cal.2d at p. 836 [reversal not required for state law error unless "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"]; *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705] [conviction must be reversed for constitutional error unless the error was harmless beyond a reasonable doubt].)  There was overwhelming evidence Davis and Winston were deeply entrenched members of the 92 Bishop Bloods gang and had committed the charged crimes in concert with each other.  The jury was properly instructed in accordance with CALCRIM No. 1401 that it could consider not only Johnson and Keller's convictions for pattern of criminal gang activity, but also the two charged

---

11     The record does not reveal the circumstances under which Detective Guillen obtained the information about Johnson and Keller's gang membership.  The question whether a defendant's Sixth Amendment right to confrontation is violated by the gang expert's reliance on testimonial hearsay in formulating his or her opinions is currently pending before the California Supreme Court.  (*People v. Sanchez* (2014) 223 Cal.App.4th 1, review granted, Jan. 21, 2014, S216681; *People v. Archuleta* (2014) 225 Cal.App.4th 527, review granted, April 11, 2014, S218640.)

19

crimes.  (See *Gardeley, supra*, 14 Cal.4th at p. 625; *People v. Loeun*, *supra*, 17 Cal.4th at p. 9.)  Having convicted Davis of both offenses, the jury necessarily found true the predicate crimes required to prove a pattern of criminal street gang activity by the 92 Bishop Bloods.  Under these circumstances, any error in admitting the evidence relayed by Detective Guillen as to Johnson's and Keller's gang membership was harmless beyond a reasonable doubt.

    4. *Substantial Evidence Supports the Jury's True Finding on the Gang Enhancements*

Davis contends there was insufficient evidence of the gang's primary activities to support the criminal street gang finding.[12]  Although he acknowledges Detective Guillen testified the primary activities of the 92 Bishop Bloods were possession of illicit drugs for sale, robberies, burglaries and vandalism and concedes those offenses are statutorily qualifying crimes (§ 186.22, subd. (e)), Davis contends Detective Guillen provided no evidence as to the frequency with which such crimes actually occurred.  (See *People v. Sengpadychith, supra,* 26 Cal.4th at pp. 323-324 [isolated criminal conduct is not enough to establish gang's primary activities].)

Contrary to Davis's contention, Detective Guillen testified the 92 Bishop Bloods committed robberies and drug sales with relative frequency.  He specifically testified on cross-examination that at least 10 robberies by 92 Bishop Bloods gang members had

---

[12]    "In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]  We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.]  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.]  'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'" (*People v. Albillar, supra,* 51 Cal.4th at pp. 59-60; accord, *People v. Livingston* (2012) 53 Cal.4th 1145, 1170.)  "The relevant facts must, however, meet the statutory requirements for a gang enhancement in order for it to apply." (*People v. Garcia* (2014) 224 Cal.App.4th 519, 523.)

occurred within the seven months prior to trial and that illicit drug sales by 92 Bishop Bloods were an ubiquitous occurrence. Asked whether he had any "statistical analysis" to support his contention, Detective Guillen explained he did not have a report or analysis with him, although he said he could obtain one, but had based his testimony on his personal knowledge and several years' experience as a patrol officer in 92 Bishop Bloods gang territory, including arrests he had personally made. This quite proper opinion evidence (see *People v. Valadez, supra,* 220 Cal.App.4th at p. 29), viewed alone or coupled with evidence of the charged robberies, was more than sufficient to establish the primary activities of the 92 Bishop Bloods. (*People v. Sengpadychith, supra,* 26 Cal.4th at p. 323; see *People v. Duran* (2002) 97 Cal.App.4th 1448, 1465 ["[p]ast offenses, as well as the circumstances of the charged crime" are relevant to the jury's consideration of the group's primary activities].)

Davis's contention the evidence is insufficient to support the jury's finding that Davis committed the charged robberies to benefit a criminal street gang also fails. A true finding on this aspect of the gang enhancement requires proof of two related elements: First, the underlying felony must have been "committed for the benefit of, at the direction of, or in association with any criminal street gang." Second, the defendant must have had "the specific intent to promote, further, or assist in any criminal conduct by gang members." (*People v. Albillar, supra,* 51 Cal.4th at p. 51; *Gardeley, supra,* 14 Cal.4th at pp. 615-616.) The first element is satisfied by substantial evidence the defendant committed the crime in concert with a known gang member. (*Albillar,* at p. 68; cf. *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 [absent evidence the gang members committed the crimes "on a frolic and detour unrelated to the gang," the jury could infer the requisite association from the fact the defendant committed the crime with a known gang member].) The second is satisfied by substantial evidence the defendant intended to commit the crime with the other gang member. (*Albillar,* at p. 68.)

Substantial evidence supported the jury's finding that the crimes were not committed as purely personal activities, but to benefit the 92 Bishop Bloods. The People established, through Davis's and Winston's tattoos and Detective Guillen's proper

21

opinion testimony based on his personal knowledge and experience as a detective familiar with the 92 Bishop Bloods, that both Davis and Winston were members of the 92 Bishop Bloods and committed the charged robberies in concert. Detective Guillen explained, in response to a hypothetical based on the facts of this case, that gang members commit such robberies to obtain money and cell phones for distribution to other gang members or for sale and the money from the sale of that contraband or from the proceeds of robberies benefits the gang by permitting it to obtain drugs for sale, firearms and other contraband, thereby increasing the gang's resources. Although Davis emphasizes on appeal, as he did to the jury, the absence of any evidence Davis or Winston referred to their gang with words, gang signs or graffiti during the robberies, Detective Guillen explained to the jury that that was not unusual. According to Guillen, although gang members do not necessarily identify themselves as gang members during the crime, they often brag about the crime afterward to their fellow gang members to enhance their reputation in the gang. Substantial evidence supported the jury's true finding on the gang enhancement.

5. *The Court Did Not Abuse Its Discretion in Admitting Substantial Evidence of Gang Culture and Practices*

Davis also contends the court erred in permitting Detective Guillen to testify to "minimally relevant" and "highly prejudicial" aspects of gang culture, such as the importance of weapons, turf, tattoos and respect in gangs generally. Davis contends such evidence was unnecessary because Davis did not contest his gang membership. Contrary to Davis's contention, Detective Guillen's testimony as to aspects of gang culture was directly relevant to proving the gang enhancement—that is, that the crimes were committed to benefit a criminal street gang. Although Davis claims he did not dispute his gang membership, neither did he stipulate to each of the elements of the gang enhancement. There was no error in admitting this evidence. (*People v. Valdez* (2012) 55 Cal.4th 82, 132-133 [gang evidence was admissible despite fact defendant offered to stipulate to fact that he was a gang member; absent stipulation as to each of the elements

of the gang enhancement, such evidence was relevant and admissible to prove enhancement]; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)

Davis also contends several photographs relating to Davis's gang membership should have been excluded under Evidence Code section 352 because such evidence was much more prejudicial than probative. Evidence Code section 352 permits a court in its discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create substantial danger of undue prejudice, confusing the issues or misleading the jury. Undue prejudice in this context means "'evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt.'" (*People v. Valdez, supra,* 55 Cal.4th at p. 133; accord, *People v. Crew* (2003) 31 Cal.4th 822, 842.) Photographs of Davis making gang signs and evidence of his tattoos were highly relevant to the gang enhancement. Deputy Guillen's testimony reinforced the meaning of that evidence in gang culture. The court instructed the jury with CALCRIM No. 1403 that it could consider this gang evidence for the limited purpose of deciding whether the prosecution had proved the gang enhancement and for no other purpose. The court did not abuse its discretion in admitting this evidence.

6. *The Reasonable Doubt Instruction Was Proper*

At the close of evidence the court instructed the jury with CALCRIM No. 220, which provides, in part, "Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendants guilty beyond a reasonable doubt, they are entitled to an acquittal and you must find them not guilty."

23

Davis contends this instruction was constitutionally deficient because it did not inform the jury the People had to prove each element of the charged crimes and the alleged enhancements beyond a reasonable doubt. (See *Victor v. Nebraska* (1994) 511 U.S. 1, 5 [114 S.Ct. 1239, 1242, 127 L.Ed.2d 583, 590] [United States Constitution requires proof of each element of a charged offense, as well as any enhancements other than a prior conviction that increases the penalty for a crime beyond the statutory maximum, beyond a reasonable doubt]; *People v. Cole* (2004) 33 Cal.4th 1158, 1208.)

We review de novo the question whether the instruction improperly stated the law or was reasonably susceptible to the meaning the defendant posits. (*People v. Posey* (2004) 32 Cal.4th 193, 218; *People v. Wyatt* (2008) 165 Cal.App.4th 1592.)[13] The question whether an instruction is improper must be determined by examining it in the context of all the instructions given to the jury. (*Victor v. Nebraska, supra,* 511 U.S. at p. 5; *People v. Cain* (1995) 10 Cal.4th 1, 36; *Wyatt,* at p. 1600.)

The Supreme Court has held that CALCRIM No. 220, which instructs the jury on the presumption of innocence and the requirement that the prosecution prove the defendant's guilt beyond a reasonable doubt, adequately explains the prosecution's burden to the jury. (*People v. Aranda* (2012) 55 Cal.4th 342, 352.) Although the *Aranda* Court did not consider the specific argument Davis makes here, every appellate court that has considered the argument has rejected it. (See *People v. Riley* (2010) 185 Cal.App.4th 754, 770; accord, *People v. Henning* (2009) 178 Cal.App.4th 388, 406; *People v. Wyatt*, *supra*, 165 Cal.App.4th at p. 1601; *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088-1089.) Those courts have reasoned that CALCRIM No. 220, which informs the jury that, when the trial court says that the People must prove something, the People must prove it beyond a reasonable doubt, combined with "the court's instruction that the People must prove each element of the offense (which is given whenever the court instructs on the

---

[13]  The Attorney General contends Davis forfeited his objection to the instruction by not raising it below. As we have repeatedly stated, however, we review any claim of instructional error that allegedly affects a defendant's substantial rights even in the absence of an objection. (§ 1259; *People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.)

elements of an offense),” adequately informs the jury that it must find that each element has been proved beyond a reasonable doubt. (*Riley,* at p. 770; *Ramos,* at pp. 1088-1089.) We agree with those courts that the instructions as a whole correctly explained each element of the charged offenses had to be proved beyond a reasonable doubt.

Davis’s related argument that the jury was not told it had to find the elements of the enhancements beyond a reasonable doubt is similarly meritless. The jury was instructed with the elements of each enhancement allegation and told the People must prove every allegation of the enhancements beyond a reasonable doubt. (See CALCRIM No. 3116 [principal armed with assault weapon]; CALCRIM No. 3146 [personal use of a firearm]; CALCRIM No. 3147 [personal use of assault weapon]; CALCRIM No. 1401 [gang enhancement].) There was no error.

### 7. *The Trial Court Properly Imposed Both the Gang and the Personal-use Enhancements*

Section 1170.1, subdivision (f), provides, “When two or more enhancements may be imposed for being armed with or using a dangerous or deadly weapon or a firearm in the commission of a single offense, only the greatest of those enhancements shall be imposed for that offense. This subdivision shall not limit the imposition of any other enhancements applicable to that offense, including an enhancement for the infliction of great bodily injury.” Misconstruing *People v. Rodriguez* (2009) 47 Cal.4th 501, 504, Davis contends the court violated section 1170.1, subdivision (f), when it imposed both the gang enhancement and the firearm-use enhancement for each robbery-related count.

In *Rodriguez* the Supreme Court held a defendant convicted of assault with a deadly weapon with true findings on the gang enhancement and personal-use enhancement was subject to one, but not both, of those enhancements. The Court explained that generally the sentence enhancement for committing a felony to benefit a criminal street gang is two, three or four years’ imprisonment (§ 186.22, subd. (b)(1)(A)); however, the punishment is increased to 10 years when the crime is a violent felony as defined in section 667.5, subdivision (c). (See § 186.22, subd. (b)(1)(C); *Rodriguez, supra,* 47 Cal.4th at p. 509.) In *Rodriguez* the defendant was subject to the 10-year gang

enhancement under section 186.22, subdivision (b), only because of his use of the firearm, which made the underlying assault crime a violent felony. (§§ 186.22, subd. (b)(1)(C), 667.5, subd. (c)(8).) "Because the firearm use was punished under two different sentence enhancement provisions, each pertaining to firearm use, section 1170.1's subdivision (f), require[d] imposition of 'only the greatest of those enhancements' with respect to each offense." (*Rodriguez,* at p. 509.)

Here, in contrast, Davis's crime of robbery qualified for the violent felony gang enhancement irrespective of his firearm use. (See §§ 186.22, subd. (b)(1)(C), 667.5, subd. (c)(9).) Accordingly, his sentence was not enhanced twice for use of a firearm; and the court did not err in imposing both the firearm-use and the gang enhancement. (See *People v. Vega* (2013) 214 Cal.App.4th 1387, 1389 [distinguishing *Rodriguez* under similar circumstances].)[14]

Finally, although not identified as an issue by the parties, for counts 2, 3 and 4 the trial court imposed the enhancement for Davis's personal use of a firearm under section 12022.5, subdivision (a), and stayed the similar personal-use enhancement under section 12022.53, subdivisions (b) and (e), pursuant to section 654. This resulted in an unauthorized sentence: The court should have imposed the section 12022.53, subdivision (b), enhancement for each of those counts and stayed the section 12022.5, subdivision (a), enhancement. (See § 12022.53, subd. (j) ["[w]hen an enhancement specified in this section has been admitted or found to be true, the court shall impose punishment for that enhancement pursuant to this section rather than imposing punishment authorized under any other provision of law, unless another enhancement provides for a greater penalty or a longer term of imprisonment"].) Accordingly, we modify the judgment to correct the unauthorized sentence.

---

14    Section 12022.53, subdivision (e)(2), prohibits imposition of the gang enhancement in addition to a firearm-use enhancement "unless the person personally used or personally discharged a firearm in the commission of the offense." Here, the jury found Davis personally used the firearm when it found the section 12022.5 enhancement allegation true. There was no error in imposing a firearm-use enhancement and a gang enhancement.

## DISPOSITION

The judgment is modified to impose the section 12022.53, subdivision (b), enhancement for counts 2, 3 and 4 and stay the similar enhancement imposed under section 12022.5, subdivision (a), pursuant to section 654.  In all other respects the judgment is affirmed.  The superior court is directed to prepare a corrected abstract of judgment and forward it to the Department of Corrections and Rehabilitation.


PERLUSS, P. J.

We concur:


SEGAL, J.


BLUMENFELD, J.[*]

---

[*]    Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.